## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **KIMBERLY A. TORNABENE**, | Case No. 3:14-cv-01564-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **NORTHWEST PERMANENTE, P.C.**, | |
| Defendant. | |

Stephen L. Brischetto, 621 S.W. Morrison Street, Suite 1025, Portland, OR 97205; Matthew C. Ellis, 621 S.W. Morrison Street, Suite 1050, Portland, OR 97205. Of Attorneys for Plaintiff.

Jeanne F. Loftis and Katherine S. Somervell, BULLIVANT HOUSER BAILEY P.C., 300 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Kimberly A. Tornabene ("Tornabene") brings this civil action against her former employer, Defendant Northwest Permanente, P.C. ("Permanente"). In her First Amended Complaint (Dkt. 15), Tornabene alleges the following claims: (1) discrimination because of race, gender, and ethnicity, in violation of Oregon Revised Statutes ("ORS") § 659A.030(b); (2) discrimination because of race, gender, and ethnicity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a); (3) retaliation because of Plaintiff's good faith

reports about Defendant's quality of care and treatment of women in the workplace, in violation of ORS § 659A.199; (4) retaliation because of Plaintiff's opposition to unlawful employment practices, in violation of ORS § 659A.030(1)(f); (5) retaliation because of Plaintiff's opposition to unlawful employment practices, in violation of Title VII, 42 U.S.C. § 2000e-3(a); (6) interference with Plaintiff's right to make and enforce contracts because of her race and ethnicity, in violation of 42 U.S.C. § 1981; (7) failure to renew Plaintiff's employment contract because of her good faith reports of inappropriate care, in violation of ORS § 441.057(2) and 42 U.S.C. § 1981; and (8) wrongful discharge, in violation of Oregon common law.

Permanente moves for summary judgment against all of Tornabene's claims. Tornabene does not oppose an order dismissing her race and ethnicity discrimination allegations in her First, Second, and Sixth Claims. For the reasons that follow, Permanente's motion is granted in part and denied in part. Permanente's motion for summary judgment is granted with respect to Tornabene's allegations of race and ethnicity discrimination in her First and Second Claims and the entirety of her Sixth and Eighth claims. Permanente's motion is denied with respect to Tornabene's First Claim (gender discrimination only), Second Claim (gender discrimination only), Third Claim, Fourth Claim, Fifth Claim, and Seventh Claim.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Tornabene is a certified clinical perfusionist, which is a medical technician whose duties include the operation of a heart-lung machine during cardiac surgery. Permanente is a corporation that employs medical professionals. Dkt. 20 ¶ 5. Tornabene began working for Permanente in January 2011 at its Kaiser Sunnyside Medical Center. *Id.* ¶ 8. Tornabene's contract with Permanente was for an annual term and could be renewed at Permanente's discretion. Dkt. 30-2 at 15; Dkt. 30-4 at 2-3. Contract renewals are based upon a performance review process that includes a self-evaluation, manager's assessment, "360 reviews," and a review meeting with the Medical Director of Operations for Surgical Services. Dkt. 26 at 2. In the "360 review," the employee's colleagues and team members submit evaluations about the employee. *Id.* at 2. If an individual's contract is renewed for three years in a row, the individual is placed on a full-time contract—or becomes "tenured"—and has the opportunity to become a Permanente shareholder. Dkt. 30-2 at 15. Tornabene's contract was renewed for 2012 and 2013, Dkt. 26-1 at 20, but was not renewed for 2014.

Dr. Robert House ("House") was the Medical Director of Operations for Surgical Services during the time that Tornabene worked for Permanente. Dkt. 30-1 at 11. The chiefs of all the surgery departments reported to him, including Dr. Yong Shin ("Shin"), the Chief of Cardiac Surgery. *Id.*; Dkt. 30-3 at 2-3. Dr. Rick Davis ("Davis") was the Chief of Cardiac

PAGE 3 – OPINION AND ORDER

Anesthesia until 2012, when he was replaced by Dr. Clayton Horan ("Horan"). Dkt. 25-3 at 2-3.
The perfusionists reported to the Chief of Cardiac Anesthesia for purposes of their clinical
practices, Dkt. 30-1 at 11, and to the Department Administrator of Anesthesia, Mark Moisan
("Moisan"), for administrative and nonclinical purposes, Dkt. 30-2 at 13. Moisan's personnel
responsibilities included addressing employee grievances and complaints. *Id.*

Tornabene was part of a team of perfusions that included Paul Dibblee ("Dibblee"),
Eileen Heller, and Tiffany Holloway. Dkt. 25-1 at 3. Dibblee was the supervising lead of the
team when Tornabene began her employment with Permanente. *Id.* at 2. In 2012, Tornabene
filed two quality of care complaints about Dibblee, describing his dangerous medical practices
and improper treatment of co-workers. Dkt. 30-6; Dkt. 30-9. Following these complaints,
Dibblee was temporarily placed on administrative leave, and he was eventually demoted.
Dkt. 25-4 at 5; Dkt. 25-2 at 14.

In Tornabene's fall 2013 "360 reviews" many of the cardiac surgeons, including Shin,
gave her negative performance evaluations. Dkt. 26-1 at 37-39. Shin had not participated in
Tornabene's fall 2011 or fall 2012 "360 reviews." Dkt. 30-3 at 76-77. As a result of the negative
evaluations of Tornabene in the fall of 2013, her contract was not renewed for 2014, and her
employment with Permanente was terminated. Dkt. 30-2 at 29.

Tornabene alleges that Shin retaliated against her for making quality of care complaints
about Dibblee because Shin was involved in the decision to hire Dibblee and recommended
Dibblee for the perfusionist position. Dkt. 30-4 at 10; Dkt. 30-3 at 17. Tornabene further alleges
that Shin discriminated against her because she was a female "with strong opinions." Dkt. 30-4
at 5-6. According to Tornabene, Shin, as the Chief of Cardiac Surgery, influenced the other

cardiac surgeons' evaluations of Tornabene's performance, leading to the nonrenewal of her contract with Permanente. Dkt. 25-1 at 10.

## A.  Tornabene's Quality of Care Complaints

After working with the perfusion team for about a year and a half, Tornabene observed that Dibblee exhibited allegedly dangerous medical practices that, according to Tornabene, threatened patient safety. On July 21, 2012, Tornabene filed a quality of care complaint with Permanente describing Dibblee's practices as well as his threatening behavior toward perfusionist team members. Dkt. 30-6. In that complaint, Tornabene stated that she was "VERY concerned about possible retaliation" because Dibblee was the department lead and was friends with Davis, his immediate supervisor. *Id.* at 2.

Moisan investigated the behavioral portion of the quality of care complaint. After interviewing perfusion staff, operating room staff, and physicians, Moisan issued his report on August 14, 2012, concluding that Tornabene's complaints against Dibblee were wholly or partially substantiated and that Dibblee was creating a hostile work environment for other employees. Dkt. 30-8; Dkt. 30-2 at 55. In his report, Moisan also stated that Dibblee exhibited an "[e]xplosive temper over everyday questions or issues, i.e., schedules, procedures, equipment," and that the other perfusionists on the team "are afraid of what will appear in their performance reviews. They are afraid of what information he imparts to other anesthesiologists and [cardiovascular] surgeons about them." Dkt. 30-8 at 1-2.

On August 31, 2012, Tornabene submitted a second complaint regarding Dibblee's quality of care. Dkt. 30-9; Dkt. 30-10. Tornabene described what she considered to be Dibblee's negligent performance. Tornabene stated that she was "grow[ing] more concerned with what appears to be a lack of focus for [Dibblee]. I feel he is struggling with even the more routine cases and I question his ability to perform well in these emergent situations." Dkt. 30-9 at 2.

On September 6, 2012, House interviewed several hospital physicians, including Shin, regarding Tornabene's second complaint about Dibblee. Dkt. 30-11. Shin told House that he thought the complaint was "too detailed to have anything in purpose other than to denigrate Mr. Dibblee's reputation." *Id.* at 1. Shin believed that the other cardiac surgeons agreed with his opinion that Dibblee did not have significant performance issues. Dkt. 30-3 at 80. Davis similarly told House that he "was unaware of any quality deficiencies on Mr. Dibblee's part. . . . [and] expressed disappointment in the manner that this complaint was brought to light and felt that it indicated more of a personal vendetta against Mr. Dibblee rather than professional in competence [*sic*]." Dkt. 30-11 at 1. Davis, however, acknowledged that "he has a close, personal relationship" with Dibblee and agreed to recuse himself from involvement in the investigation. *Id.* at 1-2.

In contrast to Shin and Davis, Dr. Joanna Matyska ("Matyska") told House that she was very concerned about Dibblee's quality issues, to the point where "she had not been sleeping well." *Id.* at 2. Matyska stated that she "does not feel that Mr. Dibblee is safe to practice at this time pending further evaluation and review of his performance." *Id.* at 2. Based on the quality of care allegations, House placed Dibblee on administrative leave pending further investigation into his performance. *Id.* at 2-3.

As Chief of Anesthesia, Horan was privy to the quality of care complaints about Dibblee. Dkt. 25-3 at 5. Horan was concerned by the complaints, and he coordinated an outside review of Permanente's perfusionist program with Moisan. *Id.* at 4-5. Chuck Dyson, a perfusionist from Kaiser Sunset in Southern California, conducted an outside review of the perfusionist team in September 2012. *Id.*; Dkt. 32 at ¶¶ 3-4. Dyson spoke with each of the perfusionsists individually. Dkt. 32 ¶ 4. Dyson concluded that "[t]here were clearly political issues going on in the

Department and there were clearly issues on the perfusion team." *Id.* ¶ 6. Dyson found

Tornabene to be a good perfusionist and stated that "she made sincere efforts to act as a

moderating force among the various personalities in the department." *Id.* ¶ 7. Dyson stated that

Dibblee was "defensive" and "agitated." *Id.* ¶ 10.

Dyson also interviewed Shin about Dibblee. *Id.* ¶ 11. According to Dyson, Shin "was

very much in Mr. Dibblee's corner and was very invested in defending him." *Id.* ¶ 12. Shin told

Dyson that "he wanted Mr. Dibblee to retire with honors" and "to be able to retire comfortably."

*Id.* Dibblee was allowed to return to the perfusion team, but he was demoted from his position as

lead perfusionist and placed on a personal improvement plan. Dkt. 25-4 at 5; Dkt. 25-2 at 14.

**B.  Shin's Treatment of Tornabene After Her Complaints**

Tornabene testified at her deposition that soon after she submitted her complaints

regarding Dibblee's performance, Shin and Dr. Tom Lampros, another cardiac surgeon, began to

treat her differently. Dkt. 30-4 at 9. Shin recruited Lampros and had the strongest influence in the

decision to hire him. Dkt. 30-3 at 4-5. Lampros became unfriendly toward Tornabene and it

became difficult for her to speak with him. Dkt. 30-4 at 9. Shin similarly became dismissive

toward Tornabene and would no longer make eye contact with her. *Id.* at 7. According to

Tornabene, after a procedure, Shin would turn and thank everyone in the room except her. *Id.*

Shin "at times became frustrated and even a little explosive with [Tornabene] in conversations

that were benign." *Id.*

Tornabene reported Shin's unpleasant behavior to Moisan many times. *Id.* at 10. Moisan

told her not to approach Shin directly about the issue. *Id.* at 11. Tornabene testified that Moisan

told her that he believed the reason she was having difficulty with Shin was that Shin felt

intimidated by her. *Id.* at 6. When Tornabene asked why that might be, Moisan said that Shin

"doesn't like strong women" and that Moisan believes that there is a "cultural element" involved

because "Shin is Korean." *Id.* at 6. Tornabene recalls that Moisan made these comments in the fall of 2013. Dkt. 31 ¶ 5. Moisan denies making these statements, though he does recall having several discussions with Tornabene in 2013 about the best way to with engage Shin. Dkt. 30-2 at 91, 95.

## C. Tornabene's 2013 Performance Review and Termination

Sometime in 2013, Lampros sought out Shin to report problems that Lampros had been having with Tornabene and her work performance. Dkt. 25-6 at 3. Lampros noticed that he had a higher incidence of drainage issues during minimally invasive procedures when Tornabene was operating the heart-lung machine. *Id.* at 4-5. Lampros testified during his deposition that he did not have the same problems with other perfusionists. *Id.* at 10. Lampros also found Tornabene to be confrontational when he tried to address the issue with her. *Id.* at 5. Shin and Dr. Shely, another cardiac surgeon who had been recruited by Shin, agreed that they were having similar problems with Tornabene. *Id.* at 6; Dkt. 30-3 at 4.

Al Arceneaux, an outside perfusionist who, like Dyson, provided Moisan with a review of the team, also noted in 2013 that Tornabene had drainage issues. Dkt. 27 ¶¶ 3-13. According to Tornabene, Arceneaux was chosen to perform the outside review because his supervisor was a friend of Shin's. Dkt. 31 ¶ 8. When Arceneaux came to Portland, Shin took him out to dinner. *Id.* ¶ 9.

Dyson stated in his declaration that the criticisms of Tornabene's performance with respect to drainage are unlikely to be valid. Dkt. 32 ¶ 8-9. Dyson explained that this is because the most common cause of such problems is the placement of the venous line, which is within the control of the surgeon, and not the perfusionist. *Id.* ¶ 9.

In fall 2013, Permanente initiated a "360 review" for Tornabene. This was Tornabene's third annual review, and she was being considered a full-time tenured contract. Dkt. 25-2 at 3.

For "360 reviews," employees are permitted to provide Permanente with a draft list of evaluators, and the employee's manager is permitted to add additional evaluators to the list. *Id.* at 19. Davis, Shin, and Dibblee were added to the list of evaluators for Tornabene's fall 2013 "360 review." Dkt. 26-1 at 23. It is unclear from the record who made these additions, although Moisan acknowledges that it could have been him. Dkt. 30-2 at 97.

Shin, Lampros, Dibblee, and Davis all provided negative comments about Tornabene on her fall 2013 "360 review." Dkt. 26-1 at 37-39. There is a wide range of scores in Tornabene's performance evaluation. Dkt. 30-1 at 48. For example, Shin gave Tornabene a score of one out of five for quality, with five being the highest or best score and one being the lowest or worst score. Dkt. 26-1 at 24. Six other people, however, gave Tornabene a score of five for the same category. *Id.* Additionally, three of the anesthesiologists gave Tornabene a score of five for accurate diagnoses and developing appropriate treatment plans. Dkt. 30-3 at 87. In contrast, Shin gave Tornabene a score of one, and Lampros gave her a two. Dkt. 26-1 at 25. Moisan also gave Tornabene low scores—a two in politeness to customers, colleagues, and staff, and threes in most other categories. Dkt. 30-22.

House spoke with Shin about whether Tornabene's contract should be renewed. Dkt. 30-1 at 45. House asked Shin if it was the opinion of the cardiac surgeons that Tonrabene's contract should not be renewed, and Shin confirmed that this was in fact the opinion of all three of Permanente's cardiac surgeons. *Id.* at 45-46.

The decision not to renew Tornabene's contract was made sometime in October 2013 at a meeting attended by House, Horan, and Moisan. Dkt. 30-2 at 11-12. At the meeting, Horan and Moisan expressed that they were generally not in favor of renewal. Dkt. 30-1 at 42-43. The decision was based upon the "360 review" and the input surrounding the evaluations. Dkt. 30-2

PAGE 9 – OPINION AND ORDER

at 104. House testified in deposition that the fact that Tornabene "had lost the confidence of the cardiac surgeons" was material to Permanente's decision not to renew her contract. Dkt. 30-1 at 51-52.

## DISCUSSION

Tornabene alleges seven claims for relief and Permanente moves for summary judgment against each of them.

## A.  Gender Discrimination Claims: ORS § 659A.030(b) and 42 U.S.C. § 2000e-2(a)

In her First and Second Claims, Tornabene alleges that Permanente discriminated against her because of her gender in violation of state and federal civil rights laws, respectively. The substantive analysis for discrimination under Title VII of the Civil Rights Act (42 U.S.C. § 2000e-2(a)) and ORS § 659A.030(b) is substantially similar, and courts often analyze such claims together. *See, e.g.*, *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007) (noting that "ORS 659A.030 is modeled after Title VII"). Under Title VII, it is unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). ORS § 659A.030(b) similarly prohibits an employer from discriminating against an individual "in compensation or in terms, conditions or privileges of employment" because of that individual's sex.

Tornabene's gender discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework. *See Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011). This framework has three steps. First, the employee or former employee must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employee successfully does so, then the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If the employer satisfies this burden, the employee must then

show that this reason is pretextual. *Id.* at 804. "A plaintiff alleging employment discrimination 'need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

### 1. *Prima facie* case

A plaintiff establishes a *prima facie* case of discrimination by showing that: (1) he or she belongs to a protected class; (2) he or she was qualified for his or her position or was performing according to his or her employer's legitimate expectations; (3) he or she suffered an adverse employment action; and (4) similarly situated individuals outside of the protected class were treated more favorably. *Id.*; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). "The requisite degree of proof necessary to establish a *prima facie* case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence." *Davis*, 520 F.3d at 1089 (quotation marks omitted). Permanente does not dispute that Tornabene has satisfied the first and third elements of her *prima facie* case. Permanente argues, however, that Tornabene cannot establish the second and fourth elements.

### a. Tornabene's performance

Permanente argues that Tornabene cannot satisfy the second element of her *prima facie* case because she was not performing up to Permanente's legitimate expectations. "The Ninth Circuit has characterized the crux of the requirement as whether the plaintiff 'adequately' performed his or her job (*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1031 (9th Cir. 2006)), which suggests a standard less than perfect performance." *Moorehead v. Chertoff*, 2008 WL 4810308, at *2 (W.D. Wash. Nov. 3, 2008). In order to satisfy this aspect of the *prima facie* case, a plaintiff may present evidence consisting of "positive performance reviews, admissions

by the employer, or even expert testimony as to an employer's legitimate expectations for the job at issue." *Abram v. City and Cnty. of San Francisco*, 2008 WL 4462104, at *3 (N.D. Cal. Oct. 3, 2008).

Permanente points to the negative reviews that Shin, Lampros, and Shely gave Tornabene, as well as the alleged drainage problems reported by Lampros, Shin, and Arceneaux, as evidence that Tornabene was not adequately performing her job. Tornabene, however, has identified evidence in the record that she was qualified for her position and that her performance was satisfactory. Tornabene's contract previously was renewed on two separate occasions, and in House's February 12, 2013 letter to the Board of Directors recommending Tornabene for tenure advancement, he stated that "[t]here have been no quality concerns raised on Ms. Tornabene's practice. She has the support of her Chief and members of her division for providing quality patient care." Dkt. 30-14 at 2. Although Shin, Lampros, and Shely later gave Tornabene negative reviews in the fall of 2013, many other evaluators gave Tornabene high scores and positive comments concerning her quality of care. Additionally, Tornabene points to Dyson's declaration, in which he states that the criticisms regarding her performance with respect to venous drainage were unlikely to be valid. Thus, given the "minimal" burden necessary to establish a *prima facie* case, Tornabene has presented sufficient facts showing that she was qualified for her position and that her performance was satisfactory at the time of the adverse employment action. *Davis*, 520 F.3d at 1089 (quotation marks omitted).

### b.  Similarly situated individuals

Permanente also argues that Tornabene cannot satisfy the fourth element of her *prima facie* case because she cannot identify similarly situated individuals outside of the protected class who were treated more favorably. Tornabene responds that Permanente treated perfusionists Tiffany Holloway, Mason Haycock, and Paul Dibblee differently from how Tornabene was

treated. Tornabene, however, cannot satisfy the fourth element of her *prima facie* case by pointing to Ms. Holloway as a similarly situated individual. Tornabene must show that "others not in her protected class were treated more favorably." *Aragon v. Republic Silver St. Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002). Holloway is a woman and is thus *within* Tornabene's protected class.[1]

Permanente argues that Paul Dibbee, as Tornabene's supervisor, was not similarly situated to her and thus Tornabene's *prima facie* case fails.[2] *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees."). Dibblee, however, was demoted from the position of lead perfusionist in October 2012 based on problematic conduct.[3] The evidence shows that even after his demotion, Dibblee continued to display problematic conduct. In 2014,

---

[1] Tornabene argues that Ms. Holloway is outside of Plaintiff's protected class because Holloway "is a female who conformed to gender stereotypes of submissiveness while plaintiff is a female who did not conform" to such stereotypes. Dkt. 29 at 30. For purposes of summary judgment, the Court does not reach this issue regarding Ms. Holloway. The Court also does not at this time reach the issue of whether Mr. Haycock is a person similarly situated to Tornabene who was treated differently.

[2] In arguing that Dibblee was not "similarly situated" to Tornabene, Permanente quotes *Whitley v. City of Portland*, 654 F. Supp. 2d 1194 (D. Or. 2009): "To be similarly situated, co-workers must have been dealt with by the same supervisor, subject to the same standards, and engaged in similar conduct." *Id.* at 1210 (quotation marks omitted). The Ninth Circuit, however, has explicitly disapproved of a strict "same supervisor" standard. In *Hawn v. Executive Jet Management*, 615 F.3d 1151 (9th Cir. 2010), the court held that "[i]t was error for the district court to impose a strict 'same supervisor' requirement;" rather, "whether two employees are similarly situated is ordinarily a question of fact" and "the employees' roles need not be identical; they must only be similar in all material respects." *Id.* at 1157 (quotation marks omitted).

[3] Permanente states in its opening and reply briefs that Dibblee was a senior clinician whose contract terms were different than those of Tornabene's and that thus Dibblee was not "similarly situated" with Tornabene. Permanente, however, has not identified any evidence in the record regarding the terms of Dibblee's contract or how the nature of his contract materially differed from Tornabene's.

after Shin was put in charge of the perfusionist department, he started hearing complaints about Dibblee's quality of work. Dkt. 30-3 at 90. Shin began to perceive problems not only with the quality of Dibblee's work, but also with Dibblee's confrontational and stubborn communication style. *Id.* at 90-95. Notwithstanding this, Shin initially approved Dibblee for re-credentialing, *Id.* at 95-96, although he later recommended that Dibblee be removed from clinical care, *Id.* at 111.

Like Dibblee, Tornabene was accused of quality of care and personality issues; however, whereas Shin recommended that Dibblee's employment be continued despite his problematic conduct, Shin gave Tornabene negative evaluations and recommended that her contract not be renewed. Thus, Tornabene has identified specific evidence that Dibblee was treated more favorably than her, although he had a similar job and displayed allegedly similar conduct issues. Thus, Tornabene satisfies the fourth element of her *prima facie* case. *See Vasquez*, 349 F.3d at 641.

### 2. Legitimate and nondiscriminatory reason

Permanente argues that it did not renew Tornabene's contract because of the negative performance evaluations she received from cardiac surgeons. This is a legitimate, nondiscriminatory reason.

### 3. Pretext

A plaintiff may show that a defendant's nondiscriminatory reason is pretextual either with indirect evidence, by presenting evidence that the explanation is not credible, or with direct evidence, by showing that the defendant's action was more likely than not motivated by a discriminatory purpose. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001). These forms of evidence are not mutually exclusive, and a court must consider the cumulative evidence presented by the plaintiff. *Id.* at 1094. A plaintiff need not introduce

additional, independent evidence of discrimination beyond what was relied on in establishing the plaintiff's *prima facie* case. *Id.*

A plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment" because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Davis*, 520 F.3d at 1089 (quotation marks omitted); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."); *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (holding that "very little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder") (second alteration in original) (quotation marks omitted).

Tornabene's evidence is sufficient to raise an issue of fact as to whether Permanente's purported reason is pretextual. Tornabene has presented facts that may lead a reasonable jury to conclude that Permanente's action was more likely than not motivated by a discriminatory purpose. "[I]n establishing that 'gender played a motivating part in an employment decision,' a plaintiff in a Title VII case may introduce evidence that the employment decision was made in part because of a sex stereotype." *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1111 (9th Cir. 2006) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989)).

Moisan told Tornabene that Shin's dismissive behavior was the result of Shin's dislike of "strong women."[4] Dkt. 30-4 at 6. *See Price Waterhouse*, 490 U.S. at 250 ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."). Shin was later allowed to participate in Tornabene's "360 review," and he gave her negative evaluations regarding not only her quality of care but also her personality in the operating room. Shin wrote:

> It would . . . be helpful if she can just entertain the possibility that there maybe [*sic*] better way to do things than 'her way,' and that her colleagues may have the potential solution that may be more beneficial to the entire team than 'her way.'. . . She seems to lack the ability and/or the desire to truly listen to the other's suggestions and/or opinions that may be different than her own.

Dkt. 26-1 at 39. Drawing all reasonable inferences in Tornabene's favor, such comments can be viewed as motivated, at least in part, by gender discrimination. *See Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1072 (9th Cir. 2003) (identifying complaints about assertive women as "difficult," having a "negative attitude," "not a team player," and "problematic" as sex stereotypes).

"Where, as here, the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1039-40 (9th Cir. 2005). *Cf. Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005) ("Stray remarks not acted upon or communicated to a decision maker are insufficient to establish pretext."). Additionally, House testified that Shin's evaluation of Tornabene was part of

---

[4] Although Moisan denies making this statement, Dkt. 30-2 at 91, at the summary judgment stage of the proceedings, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Clicks Billiards*, 251 F.3d at 1257.

the reason why her contract was not renewed. A genuine issue exists as to whether Permanente's decision to not renew Tornabene's contract was motivated by her gender. *See Dominguez-Curry*, 424 F.3d at 1041 (finding that because a reasonable factfinder could find that the employment decision was motivated at least in part by plaintiff's gender, the district court erred in granting defendant's motion for summary judgment). Permanente's motion for summary judgment against Tornabene's First and Second Claims, under ORS § 659A.030(b) and 42 U.S.C. § 2000e-2(a), respectively, is denied.

## B.  Whistleblowing Retaliation Claim: ORS § 659A.199

In her Third Claim, Tornabene alleges that Permanente retaliated against her both for her quality of care complaints about Dibblee and for her complaints about Dibblee's treatment of women in the workplace.[5] ORS § 659A.199 provides that an employer may not "retaliate against an employee . . . for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." To establish a *prima facie* case under this statute, "a plaintiff must establish three elements: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action." *Lynch v. Klamath Cnty. Sch. Dist.*, 2015 WL 2239226, at *4 (D. Or. May 12, 2015). "At the *prima facie* stage of a retaliation case, the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated." *Syrop v. Whole Foods Mkt. for the Pac. Nw.*, 2015 WL 7180488, at *2 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007)) (alteration in original) (quotation marks omitted).

---

[5] The First Amended Complaint alleges that Tornabene's Third Claim, under ORS § 659A.199, is based upon "her good faith reports that Dibblee's quality of care or his treatment of women in the workplace was in violation of state or federal law, rule or regulation." Dkt. 15 at ¶ 37.

Permanente does not dispute that Tornabene has satisfied the first and second elements of her *prima facie* case. Permanente asserts, however, that Tornabene cannot establish the third element. To establish causation, a plaintiff must show that "engaging in the protected activity was one of the reasons for [the adverse employment action] and that but for such activity [the employee] would not have been fired." *Sandberg v. City of North Plains*, 2012 WL 602434, at *6 (D. Or. Feb. 22, 2012) (alteration in original) (quotation marks omitted). "Under this analysis, 'the employee's protected activity must have been a substantial factor in the motivation to discharge the employee.'" *Id.* (quoting *Estes v. Lewis and Clark College*, 152 Or. App. 372, 381 (1998) (quotation marks omitted) (alteration in original)). A substantial factor is "'a factor that made a difference' in the discharge decision." *Id.*

Permanente argues that because Tornabene first filed a complaint against Dibblee in July 2012, but the decision not to renew her contract was not made until the fall of 2013, Tornabene cannot establish a causal link between the complaints and her termination. Permanente cites the Ninth Circuit case of *Leramo v. Premier Anesthesia Medical Group*, 514 Fed. App'x 674, (9th Cir. 2013), where the court upheld the district court's grant of summary judgment on plaintiff's retaliation claim where the decision not to renew plaintiff's contract was made 14 months after she complained about a co-worker's offensive comment. *Id.* at 676.

In *Leramo*, however, temporal proximity was the plaintiff's only evidence of a causal nexus between the protected activity and the adverse employment action. *Id.* ("When temporal proximity is the only evidence of a causal nexus between protected activity and an adverse employment action, the proximity must be much closer to create the inference."). Tornabene, however, does not rely solely upon temporal proximity to establish her *prima facie* case of whistleblowing retaliation; rather, Tornabene identifies evidence that Shin and Davis opposed

her complaints against Dibblee. For example, Tornabene testified in deposition that Shin's treatment of her changed and he became dismissive of her after she filed her complaints about Dibblee. Additionally, when House showed the complaint to Shin and interviewed Shin about it, Shin stated that the complaint was "'too detailed to have anything in purpose other than to denigrate Mr. Dibblee's reputation.'" Dkt. 30-11 at 1. House reported that Davis similarly "expressed disappointment in the manner that this complaint was brought to light and felt that it indicated more of a personal vendetta against Mr. Dibblee rather than professional [incompetence]." *Id.* Tornabene also points to Dyson's conversation with Shin in September of 2012, during which Dyson found Shin to be "very much in Mr. Dibblee's corner and . . . very invested in defending him." Dkt. 32 ¶ 12.

Permanente argues that if Shin had wanted to retaliate against Tornabene, he would have interfered with the earlier renewal of Tornabene's contract. This argument is unavailing, as Permanente does not present evidence that Shin had the choice or ability to evaluate Tornabene in her fall 2012 "360 review" or otherwise participate in the renewal decision in 2012. Davis, however, was given the chance to review Tornabene in the fall of 2012 after she filed her complaints against Dibblee, and Davis gave Tornabene negative comments. *See, e.g.*, Dkt. 26-1 at 19 ("Within the past year Ms Tornabene has exhibited behavior relative to co-workers that has been antagonistic and disruptive. Collegiality and collaboration as well as more attention to productive interactions with colleagues needs to be a priority."). Further, when Shin was first given the chance to evaluate Tornabene in the fall of 2013, he gave her quite negative reviews.

Permanente also argues that it is entitled to summary judgment on Tornabene's Third Claim, under ORS § 359A.199, because Tornabene cannot establish that retaliation was the "but-for" cause of the nonrenewal of her contract. Although "a plaintiff must be able to 'show that he

or she would not have been fired but for the unlawful discriminatory motive of the employer,'"
the Court of Appeals of Oregon has stated that the "crux of the standard . . . is whether, in the
absence of the discriminatory motive, the employee would have been treated differently." *Hardie
v. Legacy Health System*, 167 Or. App. 425, 435 (2000), *superseded on other grounds by statute
as stated in Lansford v. Georgetown Manor, Inc.*, 192 Or. App. 261 (2004). Given the evidence
in the record regarding Shin's opposition to Tornabene's complaints about Dibblee and Shin's
involvement in the decision in 2013 not to renew Tornabene's contract, a reasonable jury could
find that Tornabene was treated differently because she made her complaints about Dibblee. *See
Syrop*, 2015 WL 7180488, at *4 (stating that a "plaintiff can establish a causal link by proving
that 'the biased [co-worker] influenced or was involved in the decision or decisionmaking
process.'").

Tornabene has presented evidence that Shin opposed Tornabene's complaints about
Dibblee's quality of care and that Shin was involved in the decision not to renew Tornabene's
contract. A reasonable jury could infer that Tornabene's termination was the result of retaliation
on the part of Shin. "'When the motive for a discharge is in dispute, and the evidence is subject
to more than one interpretation, the resolution of the issue is properly left to the trier of fact.'"
*Lynch*, 2015 WL 2239226, at * 5 (quoting *Hirsoveseu v. Shangri-La Corp.*, 113 Or. App. 145,
149 (1992)). Because Tornabene has raised a genuine issue of material fact as to whether
Permanente's decision not to renew her contract was motivated by retaliation for her complaints
about Dibblee, Permanente's motion for summary judgment against Tornabene's Third Claim is
denied.

**C. ORS § 659A.030(1)(f) and 42 U.S.C. § 2000e-3: Retaliation for Opposition to Unlawful Employment Practices**

In her Fourth and Fifth Claims, Tornabene alleges that Permanente retaliated against her because of her opposition to unlawful employment practices. As with discrimination, the substantive analysis for retaliation in violation of ORS § 659A.030(1)(f) and 42 U.S.C. § 2000e-3 under Title VII is substantially similar, and courts often analyze such claims together. *See, e.g.*, *Warzecha v. Kemper Sports Mgt., Inc.*, 2012 WL 2396888, *7 (D. Or. 2012) ("Retaliation claims brought under ORS 659A.030 and those brought under Title VII are analyzed in the same manner. . . .") (citing *Dawson*, 630 F.3d at 935). ORS § 659A.030(1)(f) makes it unlawful "[f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice." Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3.

To establish a *prima facie* case of retaliation under either state or federal law, Tornabene must show that: (1) she engaged in a protected activity; (2) Permanente subjected her to an adverse employment action; and (3) "a causal link exists between the protected activity and the adverse action." *Manatt v. Bank of Am.*, 339 F.3d 792, 800 (9th Cir. 2003) (quotation marks omitted). If Tornabene can establish a *prima facie* case, "then *McDonnell Douglas* burden-shifting is appropriate." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

Permanente does not dispute that Tornabene can establish the first and second elements of her *prima facie* case. Permanente argues, however, that Tornabene cannot show a causal link between the alleged protected activity and the nonrenewal of her contract.

### 1. *Prima facie* case

To show a causal link between an alleged protected activity and an adverse employment action, a plaintiff must show that the protected activity constituted the "but-for cause" of the employer's adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Oregon courts nominally use a "substantial factor" test but construe the test as a "but for" standard. *See Hardie*, 167 Or. App. at 436.

A plaintiff may satisfy the causation element through "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). A causal link "'can be inferred from timing alone' when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004). The Ninth Circuit has held that events occurring within intervals of two or three months "are sufficiently proximate to support an inference of causation." *Id.*

Here, the temporal proximity between the alleged protected activity and the adverse employment decision is very close. Throughout 2013, Tornabene had several conversations with Moisan regarding Shin's "dismissive and unpleasant" treatment of her. Dkt. 30-2 at 94-95; Dkt. 30-4 at 10. She recalls that Moisan told her during one such conversation in the fall of 2013 that Shin was intimidated by Tornabene because she "was a strong woman." Dkt. 31 ¶ 25. The decision not to renew Tornabene's contract was made in October 2013. Thus, because the "adverse employment action follow[ed] on the heels of protected activity," Tornabene has presented sufficient evidence to withstand summary judgment on the issue of whether there was

a causal link between her protected activity and Permanente's decision not to renew her contract. *Villiarimo*, 281 F.3d at 1065.

### 2. Pretext

As discussed above, Permanente has identified a legitimate reason for not renewing Tornabene's contract. Thus, the burden shifts to Tornabene to show that Permanente's stated reason is pretextual.

Tornabene has identified sufficient evidence to create a question of fact as to whether the decision not to renew her contract was based on a retaliatory motive harbored by Moisan. During Tornabene's final "360 review," someone added the names of Shin, Dibblee, Moisan, and Davis to the list of Tornabene's reviewers. Although Moisan testified that he did not recall who made the decision to add these individuals, he acknowledged that it could have been him who made the decision. Additionally, even though Moisan knew that Davis and Shin had expressed opposition to Plaintiff's complaints about Dibblee, Moisan made no effort to speak with them to ensure that their reviews did not reflect any retaliatory motive. Dkt. 30-2 at 100.

Moisan himself also gave Tornabene low scores in her 2013 "360 review." He gave her a two out of five in politeness to customers, colleagues, and staff, and a three out of five in most other categories. Dkt. 30-22. Moisan commented that Tornabene "[m]ust develop the trust of her surgeon team and own the need for better relationships with her team." Dkt. 30-22 at 15. The decision not to renew Tornabene's contract was based, in part, upon the evaluations that she received in her "360 review."

Furthermore, not only was Moisan involved with Tornabene's "360 review," but he was also directly involved in the decision not to renew Tornabene's contract, as he was present at the meeting during which the decision was made. House testified that at the meeting, Moisan was "[g]enerally . . . not in favor of renewal." Dkt. 30-1 at 43. Thus, Tornabene has "put forward

specific and substantial evidence" of retaliatory motive, creating a triable issue as to whether

Permanente's articulated reasons for not renewing her contract were pretextual. *Holmes v.*

*Tenderloin Housing Clinic, Inc.*, 2011 WL 2843729, *8 (quoting *Vasquez*, 349 F.3d at 642)

(quotation marks omitted). Permanente's motion for summary judgment against Tornabene's

Fourth and Fifth Claims, under ORS § 659A.030(1)(f) and 42 U.S.C. § 2000e-3, respectively, is

denied.

**D.  ORS § 441.057(2): Retaliation for Reporting Inappropriate Care**

In her Seventh Claim, Tornabene alleges that her contract was not renewed because of

her good faith reports about quality of care, in violation of ORS § 441.057(2). ORS § 441.057(2)

provides that: "A health care facility, or person acting in the interest of the facility, may not take

any disciplinary or other adverse action against any employee who in good faith brings evidence

of inappropriate care or any other violation of law or rules to the attention of the proper authority

solely because of the employee's action as described in this subsection." Permanente moves for

summary judgment against Tornabene's Seventh Claim on three grounds. First, Permanente

argues that it is neither a "health care facility" nor a "person acting in the interest of the facility."

Second, Permanente argues that Tornabene is not an "employee" under the statute. Third,

Permanente argues that it did not take any adverse action against Tornabene "solely" because of

her quality of care complaints.

**1.  A person acting in the interest of a health care facility**

The terms used in ORS Chapter 441 have the definitions that are set forth in ORS

§ 442.015 "unless the context requires otherwise." ORS § 442.015. Under ORS

§ 442.015(12)(a), a "health care facility" includes a hospital, which is in turn defined by ORS

§ 442.015(15)(a) as "[a] facility with an organized medical staff and a permanent building that is

capable of providing 24-hour inpatient care to two or more individuals who have an illness or

injury . . . ." Because Permanente is a corporation, it is a "person" under ORS § 441.057(2). *See* ORS § 442.015(24) (including "a corporation" in the definition of "person").

Permanente argues that although it has a contractual relationship with Kaiser Sunnyside Medical Center under which Permanente is responsible for the provision of medical services, the physicians at Permanente are independent contractors and not agents of Kaiser. Thus, Permanente argues, it is not a person "acting in the interest of the facility." Permanente, however, has not identified any evidence that would support this assertion. Tornabene, in contrast, has shown that Permanente-contracted physicians hold administrative positions in the hospital. Dkt. 31 ¶ 4. Thus, a reasonable jury could conclude that those physicians, as administrators, and thus Permanente itself, acted "in the interest" of the hospital.

## 2. Employee

Permanente also argues that Tornabene is not an "employee" under ORS § 441.057(2) because her contract was with Permanente, which is not a "health care facility." The term "employee," however, is not defined in either ORS § 442.015 or ORS § 441.057(2). Additionally, the statute states that "[a] health care facility, or person acting in the interest of the facility, may not take any disciplinary or other adverse action against *any* employee." ORS § 441.057(2) (emphasis added). Thus, the statute does not require that the individual seeking its protection be an "employee" of a "health care facility." As stated above, Tornabene has presented evidence that Permanente is a person "acting in the interest" of a health care facility, and Tornabene was Permanente's employee.

## 3. Adverse action

Permanente also argues that Tornabene cannot establish a "sole" causal link between her quality of care complaints and the nonrenewal of her employment contract. The Court notes that the parties do not cite any cases interpreting ORS § 441.057(2), and the Court is unaware of any

case law examining a claim under this subsection of Oregon law. As noted above, however, Tornabene has identified evidence showing a causal link between her quality of care reports about Dibblee and the nonrenewal of her contract. Based upon this evidence, a reasonable jury could conclude that Tornabene was denied renewal of her employment contract solely because of her quality of care complaints.[6]

Permanente's motion for summary judgment against Tornabene's Seventh Claim, under ORS § 441.057(2), is denied.

**E.  Common Law Wrongful Discharge**

In her Eighth Claim, Tornabene alleges that Permanente wrongfully discharged her in retaliation for Tornabene's complaints about Dibblee's quality of care. Tornabene also bases her common law wrongful discharge claim on retaliation for her "exercise of rights of public importance related to her role as an employee and for fulfilling important societal duties in ORS 41.675, ORS 441.055, ORS 441.057 and ORS Ch 677." Dkt. 15 at 7. ORS §§ 41.675, 441.055, and 441.057 all protect employees who provide information to peer review committees. ORS Chapter 677 regulates Medicine, Podiatry, and Acupuncture.

Permanente moves against Tornabene's wrongful discharge claim, arguing that Tornabene is precluded from bringing this interstitial tort because she has an adequate statutory remedy. Under Oregon law, a claim for common law wrongful discharge is not available if "(1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy

---

[6] The Court will reserve for another day the question of whether "solely" means "not for any other legitimate reason." It would seem to be an odd result if a defendant could avoid liability under ORS § 441.057(2) by arguing that it failed to renew a plaintiff's contract based on improper sex discrimination and, thus, not "solely" because of that plaintiff's quality of care complaints.

(regardless of whether the courts perceive that remedy to be adequate)." *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1145-46 (D. Or. 2013) (citation omitted); *see Wall v. Sentry Ins.*, 2015 WL 350683, at *3 (D. Or. Jan. 26, 2015) (holding that the test for preclusion of a common law wrongful discharge claim is disjunctive).

In deciding whether an adequate statutory remedy exists, "the question . . . is not whether the existing remedy is 'the best possible remedy' or 'identical to the tort remedy' but merely whether it is sufficient to 'adequately protect the employment related right.'" *Gahano v. Sundial Marine & Paper*, 2007 WL 4462423, at *15 (D. Or. Dec. 14, 2007), *adhered to on reconsideration*, 2008 WL 185793 (D. Or. Jan. 17, 2008) (quoting *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1134 (D. Or. 1998)).

Because Tornabene's wrongful discharge claim is based upon her complaints against Dibblee, it is based upon the same conduct as her Third Claim, alleging whistleblowing retaliation under ORS § 659A.199. Tornabene argues that the text of ORS § 659A.199 allows for both statutory and common law remedies. *See* ORS § 659A.199(2) ("The remedies provided by this chapter are in addition to any common law remedy or other remedy that may be available to an employee for the conduct constituting a violation of this section.").

The District of Oregon has previously found, however, that a common law wrongful discharge claim provides the same remedies as a whistleblower retaliation claim under ORS § 659A.199 and that the two claims cannot be pursued simultaneously. *Duran v. Window Products, Inc.*, 2010 WL 6420572, at *5 (D. Or. Dec. 22, 2010), *report and recommendation adopted*, 2011 WL 1261190 (D. Or. Mar. 29, 2011) ("ORS 659A.199 provides an adequate (if not better) remedy [than a common law wrongful discharge claim]."). Because Tornabene's common law wrongful discharge claim is based upon the same conduct as her ORS § 659A.199

PAGE 27 – OPINION AND ORDER

claim, and ORS § 659A.199 provides an adequate statutory remedy, the Court concludes that Tornabene's common law wrongful discharge claim is precluded.[7] *See Shaw v. Action Financial Servs., LLC*, 2014 WL 4404961, at *3 (D. Or. Sept. 5, 2014) ("'[T]he presence of an adequate statutory remedy precludes a common law wrongful discharge claim based on the same conduct.'"). Accordingly, Permanente's motion for summary judgment against Tornabene's Eighth Claim, alleging common law wrongful discharge, is granted.

## CONCLUSION

Permanente's motion for summary judgment (Dkt. 24) is GRANTED IN PART and DENIED IN PART. Permanente's motion is granted with respect to Tornabene's allegations of race and ethnicity discrimination in her First and Second Claims and the entirety of her Sixth and Eighth claims. Permanente's motion is denied with respect to Tornabene's First Claim (gender discrimination only), Second Claim (gender discrimination only), Third Claim, Fourth Claim, Fifth Claim, and Seventh Claim.

**IT IS SO ORDERED**.

DATED this 28th day of December, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[7] Permanente has asserted as an affirmative defense that Tornabene's First Amended Complaint fails to state a claim upon which relief can be granted. Dkt. 20 at 7 (Answer to First Amended Complaint). Tornabene argues that because Permanente has alleged that Tornabene fails to state a claim for relief under ORS § 659A.199, Permanente cannot claim that this statute provides an adequate remedy that displaces a wrongful discharge claim. *See Duran*, 2010 WL 6420572, at *5 (asserting that if the defendant successfully argued on summary judgment that the plaintiff could not state a claim under ORS § 659A.199, then the plaintiff had "no other existing and adequate remedy and may pursue a wrongful discharge claim."). In *Duran*, however, the court concluded that because the plaintiff could pursue a claim under ORS § 659A.199, his wrongful discharge claim was precluded. Similarly, here the Court denies Permanente's motion for summary judgment against Tornabene's Third Claim (alleging a violation of ORS § 659A.199). Therefore, Tornabene's common law wrongful discharge claim is precluded.